UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

LINDA RANDOLPH,

        Plaintiff,

     -v.-

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,[1]

        Defendants.
------------------------------------------------------------X

**REPORT AND
RECOMMENDATION**

12-cv-8539 (LTS) (JLC)

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 6/30/14

**JAMES L. COTT, United States Magistrate Judge.**

**To The Honorable Laura Taylor Swain, United States District Judge:**

Plaintiff Linda Randolph brings this action seeking judicial review of a final

determination by Defendant Carolyn Colvin, Acting Commissioner of Social Security

("Commissioner"), denying Randolph's application for Social Security Disability ("SSD") and

Supplemental Security Income ("SSI") disability benefits. The parties have cross-moved for

judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. For

the reasons set forth below, I recommend that Randolph's motion be granted to the extent that

the case be remanded to the Commissioner for further proceedings and the Commissioner's

cross-motion be denied.

## I. BACKGROUND

### A. Procedural History

Randolph filed her application for SSD and SSI benefits on November 16, 2009, alleging

---

[1]    Carolyn W. Colvin, who became the Acting Commissioner of Social Security on
February 14, 2013, should be substituted as the Defendant in this action in place of Michael J.
Astrue. *See* Fed. R. Civ. P. 25(d).

USDC SDNY
DATE SCANNED 6/30/14

that she had been disabled since June 1, 2008.  Administrative Record ("Rec.") (Dkt. No. 8), at

104-10, 123.[2]  The Social Security Administration ("SSA") denied her application on February

17, 2010.  *Id.* at 64.  Randolph requested a hearing before an Administrative Law Judge ("ALJ")

on June 4, 2010.  *Id.* at 70.  Represented by counsel, Randolph appeared at a hearing held before

ALJ Robert Gonzalez on June 21, 2011.  *Id.* at 26-61.  The ALJ denied Randolph's claims in a

written decision dated June 30, 2011, finding that she was not disabled.  *Id.* at 9-25.  The SSA

Appeals Council denied Randolph's request for review on September 19, 2012, making the

ALJ's determination the Commissioner's final decision.  *Id.* at 1-6.

The current action was initiated on November 21, 2012 when Randolph, represented by

counsel, filed a complaint seeking judicial review of the Commissioner's decision under 42

U.S.C. § 405(g).  Complaint ("Compl.") (Dkt. No. 1).  The Commissioner filed her answer on

July 23, 2013 (Dkt. No. 10).  Randolph moved for judgment on the pleadings pursuant to Rule

12(c) on September 12, 2013, seeking reversal of the Commissioner's decision and a remand

solely for the calculation of benefits, or alternatively, for a new hearing.  *See* Motion for

Judgment on the Pleadings (Dkt. No. 12); Memorandum of Law in Support of Plaintiff's Motion

for Judgment on the Pleadings ("Pl. Mem.") (Dkt. No. 13).  The Commissioner filed a response

on December 5, 2013, in which she also cross-moved for judgment on the pleadings.  *See* Cross-

Motion for Judgment on the Pleadings (Dkt. No. 21); Memorandum of Law in Support of the

Commissioner's Cross-Motion for Judgment on the Pleadings and in Opposition to Plaintiff's

Motion for Judgment on the Pleadings ("Def. Mem.") (Dkt. No. 22).  Randolph filed a reply on

---

[2]      The Administrative Record consists of numerous documents divided into three separate
docket entries on ECF (Dkt. Nos. 8, 8-1, and 8-2).  For the sake of clarity and consistency,
citations to the Administrative Record will refer to the pagination that runs sequentially through
all of the various entries, with page numbers found in bold in the lower right-hand corner.

December 19, 2013. Reply Memorandum in Support of Plaintiff's Motion for Judgment on the Pleadings ("Pl. Reply") (Dkt. No. 23).

## B. The Administrative Record

### 1. Randolph's Background

Randolph was born on August 22, 1966 and, at the time of her application for SSD and SSI benefits, was 43 years old. Rec. at 104. She attained a GED and currently lives with one roommate in Peekskill, New York. *Id.* at 40, 104, 129. Randolph has minimal recent employment experience. In the 15 years prior to her claimed disability, Randolph reported that she worked as a cashier at Burger King at an unknown date, as a bus cleaner in 2003, and as a maintenance worker from 2007 to 2008. *Id.* at 124. She claims she lost her job as a maintenance worker because she fell asleep when she was supposed to be working. *Id.* at 59. She also testified that she sometimes assists at her friend's hot dog truck approximately two days per week. *Id.* at 45-46.

Randolph reported no problems with personal care. *Id.* at 137. She is capable of microwaving and boiling her own food. *Id.* at 138. She said in a form filed with the New York State Office of Temporary and Disability Assistance that she can complete "daily basic chores," such as cleaning, doing laundry, and ironing, but cannot drive due to a suspended driver's license. *Id.* at 139. However, she also testified at her ALJ hearing that her roommate does most of the cleaning and her mother does her laundry. *Id.* at 56-57. She stated that she spends some of her free time text messaging and going out with friends. *Id.* at 44-45. She reported difficulty finishing tasks she starts, because she gets "frustrated" and is "unable to concentrate." *Id.* at 142. She also reported difficulty following spoken and written instructions, and getting along with others. *Id.*

3

Randolph spent 17 years in prison for drug-related crimes. *Id.* at 30-32. She claims that she has not used drugs or alcohol since March 19, 2009, *id.* at 35, although as outlined below, her testimony at the ALJ hearing could be construed as suggesting otherwise. Randolph attends a substance abuse program on a daily basis. *Id.* at 136, 141.

Randolph alleges that she became disabled and unable to work as of June 1, 2008 because she suffers from Bipolar Disorder and Borderline Personality Disorder. Compl. at ¶ 8; Pl. Mem., at 6; Rec. at 123. Because of her condition, she claims that she has a limited ability to follow work rules, relate with co-workers, use judgment, handle stress, interact with supervisors, maintain concentration, and understand, remember, and carry out instructions. Compl. at ¶ 8.

### 2.   Medical Evidence

Multiple reports were made part of the record in connection with Randolph's November 16, 2009 application for SSD and SSI disability benefits, including: an initial psychiatric evaluation completed by Westchester Medical Center Correctional Health Services ("WMC") dated March 24 and 27, 2009, Rec. at 170-75; an initial assessment completed by therapist Sheila Boylan at the Peekskill Community Service Center ("PCSC") dated October 6, 2009, *id.* at 261-67; an Employability Assessment from PCSC dated October 20, 2009, *id.* at 268-71; a psychiatric evaluation completed by Dr. Anthony Capozzi at PCSC dated November 13, 2009, *id.* at 194-95; a psychiatric evaluation completed by Dr. Lisa Orsini, at North Disability Services ("NDS") dated February 2, 2010, *id.* at 207-12; a Mental Residual Functional Capacity Assessment and Psychiatric Review Technique completed by Dr. J. Alpert, a consulting physician, dated February 17, 2010, *id.* at 215-33; an Employability Assessment completed by registered nurse Samuel Agar of the Westchester Department of Community Mental Health on June 10, 2010, *id.* at 277-81; a psychiatric evaluation and other treatment notes by her treating

4

physician, Dr. Arudi Srihari, of Westchester Jewish Community Services ("WJCS") dated July 19, 2010 through May 6, 2011, *id.* at 242-59; and a Residual Functional Capacity Questionnaire completed by

Dr. Srihari and social worker Kay Griffin dated May 20, 2011, *id.* at 287-88.

### a. Miscellaneous Evaluations

In the March 24 and 27, 2009 initial psychiatric evaluation at WMC, where she was incarcerated, Randolph was diagnosed with cocaine dependence, cocaine-induced mood disorder, Bipolar Disorder, and Borderline Personality Disorder. *Id.* at 175. These diagnoses were affirmed in a follow-up evaluation dated July 24, 2009, which noted Randolph was participating in a drug program, and in a discharge summary dated September 11, 2009. *Id.* at 178, 180.

Boylan's October 6, 2009 initial assessment at PCSC, following Randolph's release from prison, reported that Randolph suffered from a depressed mood, mood lability, agitation, tearfulness, isolation, phobias, paranoia, and poor appetite. *Id.* at 261. She was diagnosed with cocaine dependence, alcohol abuse, and a personality disorder. *Id.* at 267. An employment assessment completed at PCSC on October 20, 2009 concluded that Randolph was unable to participate in any activities, including employment, except for treatment and rehabilitation-related programs. *Id.* at 271. On November 13, 2009, Dr. Capozzi conducted a psychiatric evaluation that found Randolph to have a limited base of knowledge and difficulty with certain counting skills and multiplication. *Id.* at 195. Randolph was pleasant and cooperative, her mood was "neutral," and her thought process "intact." *Id.* In a November 24, 2009 follow-up appointment with Boylan, Randolph reported inability to sleep and function outside of jail, displaying poor life skills, following 17 years of incarceration. *Id.* at 200.

5

On February 2, 2010, Randolph reported to Dr. Orsini at NDS that she had concentration difficulties, social withdrawal, and depression symptoms. *Id.* at 208. She described a history of visual hallucinations, memory deficits, concentration difficulties, and difficulty learning new material. *Id.* at 208-09. Dr. Orsini reported that Randolph made appropriate eye contact, spoke clearly, appeared coherent, and presented no evidence of hallucinations, delusions, or paranoia. *Id.* at 209-10. However, she also reported that Randolph appeared anxious, had impaired concentration and memory skills, and exhibited limited insight and poor judgment. *Id.* at 210. Dr. Orsini opined that Randolph "can follow and understand simple directions and instructions," "is able to perform simple tasks independently," has "some difficulties maintaining concentration," and "may have some difficulties maintaining a regular schedule due to psychiatric symptoms." *Id.* at 211. She noted that Randolph had a history of difficulty making appropriate decisions, relating with others, and coping with stress. *Id.* She diagnosed Randolph with Bipolar Disorder and cocaine abuse in early, full remission. *Id.*

### b. Treatment at WCJS

Randolph received regular treatment at WCJS beginning on June 4, 2010, *id.* at 243, working with Dr. Srihari and social worker Griffin. *Id.* at 243-301. According to WCJS's treatment plan, Randolph required weekly therapy given her mood disorder diagnoses and need to learn skills for coping with her emotional problems. *Id.* at 245. In Dr. Srihari's psychiatric evaluation of Randolph on July 19, 2010, he observed that she was restless, anxious, and had an impaired memory and concentration. *Id.* at 245. He diagnosed her with Bipolar Disorder and Histrionic Personality Disorder. *Id.* at 248.

Treatment notes described Randolph's continuing anxiety and emotional instability, goal of reducing fear and improving social/job functioning, and desire to seek employment. *Id.* at

6

249, 252, 254. A report from Dr. Srihari on June 3, 2011 stated that Randolph had been stable and on her medication over the prior month. *Id.* at 290. However, notes for the period April 27, 2011 to July 26, 2011, while describing a "good therapeutic relationship" and some progress, explained that Randolph continued to have problems with aggression and social functioning. *Id.* at 295.

### c.  Consultative Examinations and Assessments

On February 17, 2010, Dr. Alpert reviewed the available evidence and completed a Mental Residual Functional Capacity Assessment and Psychiatric Review Technique. *Id.* at 215-33. He concluded that Randolph "is able to understand and remember simple instructions, sustain attention and concentration adequately, respond and relate adequately to coworkers and supervisors and to adapt to changes in the workplace." *Id.* at 218. He found that Randolph had mild restrictions in performing the activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and insufficient evidence of repeated episodes of deteriorations. *Id.* at 230.

The Employability Assessment dated June 10, 2010 reported that Randolph's interview behavior was hostile, and that she was angry and irritable. *Id.* at 279. She had normal thought process and intellect, had intact memory, but lacked social judgment and had poor attention and concentration. *Id.* at 279-80.

Dr. Srihari and Griffin's Residual Functional Capacity Questionnaire of May 20, 2011 reported that Randolph was not in a condition to function in a work setting because she was impulsive, and unable to sustain attention or concentration. *Id.* at 287. They concluded that her ability to function in a work setting was "seriously limited." *Id.* Moreover, they found her to be seriously limited in her ability to follow work rules, relate to co-workers, deal with the public,

7

use judgment, function independently, maintain attention/concentration, and understand, remember, and carry out simple job instructions. *Id.* at 287-88. They found that she had poor or no ability to interact with supervisors, deal with work stresses, and understand, remember, and carry out detailed job instructions. *Id.*

### 3. ALJ Hearing

ALJ Gonzalez held a hearing on June 21, 2011 to consider Randolph's eligibility to receive SSD and SSI benefits, at which Randolph was represented by counsel. *Id.* at 26-61. The ALJ questioned Randolph about her education and her history of incarceration. *Id.* at 28-33. The ALJ then asked about Randolph's substance abuse program, and about any current use of drugs or alcohol. *Id.* at 33-35. The ALJ asked Randolph to identify her treating physicians, and Randolph named Dr. Srihari and her social worker, Griffin. *Id.* at 35. Randolph, when questioned about her employment history, described her job cleaning buses but otherwise had difficulty remembering where and when she had worked. *Id.* at 36-39.

The ALJ subsequently asked Randolph questions about her daily life and medications. *Id.* at 39-46. Even though Randolph previously testified that she had not used drugs or alcohol since March 19, 2009, *id.* at 35, Randolph stated that she sometimes does not take her medication when she is using drugs and that she sometimes visits bars with friends. *Id.* at 42, 205. The ALJ then asked Randolph about her history of mental treatment and the effects of medication. *Id.* at 46-48.

Randolph's counsel subsequently questioned her about her Bipolar Disorder, Borderline Personality Disorder, and Adult ADHD. *Id.* at 48-52. Randolph testified that she is often so depressed that it is difficult to get out of bed, that sometimes she becomes manic and hears voices, and is "always" paranoid. *Id.* at 48-50. She testified that she cannot concentrate well

8

enough to read a book or watch a movie, and often has difficulty following directions. *Id.* at 50-51. She said that she has a bad memory and often forgets appointments or other commitments that she is not reminded of or does not have a routine of doing. *Id.* at 51. The ALJ followed up by asking Randolph whether she had any issues attending her substance abuse program, to which Randolph responded in the negative. *Id.* at 53. She went on to testify that she can follow a routine when she is told what to do. *Id.* at 55-56.

Finally, Randolph's counsel questioned her about her household chores and her methods of transportation. *Id.* at 56-58. Randolph then discussed her work history, and she testified that she lost her last job because she fell asleep while working. *Id.* at 58-59.

## II.   DISCUSSION

### A. Legal Standards

#### 1.   Judicial Review of Commissioner's Determination

An individual may obtain judicial review of a final decision of the Commissioner in the "district court of the United States for the judicial district in which the plaintiff resides." 42 U.S.C. § 405(g). The district court must uphold the Commissioner's final decision if it applied the correct legal standards and was supported by substantial evidence. *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004), *amended on other grounds*, 416 F.3d 101 (2d Cir. 2005). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)) (internal quotation marks and alterations omitted).

As part of its analysis, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn."

9

*Selian*, 708 F.3d at 417 (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam)).  The court may then "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g); *see also Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir. 1988) (court may grant judgment as matter of law on basis of pleadings and administrative record).  "Remand is 'appropriate where, due to inconsistencies in the medical evidence and/or significant gaps in the record, further findings would . . . plainly help to assure the proper disposition of [a] claim.'"  *Lackner v. Astrue*, No. 09 Civ. 895 (NAM) (VEB), 2011 WL 2470496, at *7 (N.D.N.Y. May 26, 2011) (citation omitted).

The substantial evidence standard is a "very deferential standard of review," *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012), and the reviewing court "must be careful not to substitute its own judgment for that of the Commissioner, even if it might justifiably have reached a different result upon a *de novo* review." *DeJesus v. Astrue*, 762 F. Supp. 2d 673, 683 (S.D.N.Y. 2011) (quoting *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991)) (internal quotation marks and alterations omitted).  In other words, "once an ALJ finds facts, [a court] can reject those facts 'only if a reasonable factfinder would *have to conclude otherwise*.'"  *Brault*, 683 F.3d at 448 (quoting *Warren v. Shalala,* 29 F.3d 1287, 1290 (8th Cir. 1994)).

### 2.  Commissioner's Determination of Disability

Under the Social Security Act, "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  Physical or mental impairments must be "of such severity that [the individual]

10

is not only unable to do [her] previous work but cannot . . . engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

As a general matter, in assessing whether a claimant's impairments meet the statutory definition of disability, the Commissioner "must make a thorough inquiry into the claimant's condition and must be mindful that the Social Security Act is a remedial statute, to be broadly construed and liberally applied." *Mongeur*, 722 F.2d at 1037; *see also Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009). Specifically, the Commissioner's decision must ultimately take into account factors including: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Mongeur*, 722 F.2d at 1037 (citations omitted).

### a. Five-Step Inquiry

The Commissioner's inquiry into disability follows a sequential, five-step inquiry. *See Cichocki v. Astrue*, 729 F.3d 172, 174 n.1 (2d Cir. 2013); *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996). At the first step, the Commissioner must determine whether the claimant is presently employed. 20 C.F.R. § 404.1520(a)(4)(i). If she is not, the Commissioner then determines at step two if the claimant has a "severe" impairment limiting her capacity to work. 20 C.F.R. § 404.1520(a)(4)(ii). If so, under step three, the Commissioner considers whether it satisfies the criteria of one of the impairments included in the SSA's "listings." 20 C.F.R. § 404.1521(a); Pt. 404, Subpt. P, App. 1. Where the impairment is properly listed, the claimant is found disabled, 20 C.F.R. §§ 404.1520(a)(4), (d); where it is not, the Commissioner continues to the fourth step to determine the claimant's residual functional capacity ("RFC") to perform her past relevant

work. 20 C.F.R. §§ 404.1520(f), 1521(e), 1545. Finally, if the claimant is unable to perform her past work, the Commissioner completes the fifth step by determining whether claimant, based on her RFC, age, education, and experience, is capable of undertaking any other work in the national economy. 20 C.F.R. § 404.1520(g)(1).

In steps one through four of the sequential analysis, it is the claimant who bears the burden of proving disability. *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008). If the claimant is successful in meeting the requirements to reach the fifth and final step, the burden shifts to the Commissioner, who must establish that the claimant is capable of performing some work in the national economy. *See Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009).

Generally, at step five, the Commissioner satisfies her burden of establishing a claimant's capacity to perform available work by relying on the applicable medical vocational guidelines. *See Rosa v. Callahan*, 168 F.3d 72, 78 (2d Cir. 1999) (citing *Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir. 1986)). Known as the "Grids," these guidelines "take into account the claimant's residual functional capacity in conjunction with the claimant's age, education and work experience" to provide a determination as to an applicant's capacity for work. *Id.* (citation omitted). However, exclusive reliance on the Grids constitutes error where there exist nonexertional limitations that significantly affect the claimant's capacity for work. *See Zabala v. Astrue*, 595 F.3d 402, 410-11 (2d Cir. 2010) (citation omitted).

"Limitations or restrictions which affect a claimant's ability to meet the demands of jobs other than the strength demands, that is, other than sitting, standing, walking, lifting, carrying, pushing or pulling, are considered nonexertional." *Id.* (citation omitted). This limitation becomes significant when it causes an "additional loss of work capacity beyond a negligible one or . . . one that so narrows a claimant's possible range of work as to deprive him of a meaningful

12

employment opportunity." *Bapp*, 802 F.2d at 606. To determine whether a limitation is significant, the Commissioner must consider whether the claimant has the abilities to "understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting." Social Sec. Ruling ("SSR") 85-15, 1985 WL 56857, at *4 (Jan. 1, 1985); *see also Acevedo v. Astrue*, No. 11 Civ. 8853 (JMF) (JLC), 2012 WL 4377323, at *14 (S.D.N.Y. Sept. 4, 2012), Report and Recommendation *adopted by* 2012 WL 4376296 (Sept. 24, 2012). If the Commissioner determines that the claimant does not have these abilities, the limitations are sufficiently significant that she is precluded from looking only to the Grids; instead, the Commissioner must "introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain and perform." *Rosa*, 168 F.3d at 78 (quoting *Bapp*, 802 F.2d at 603); *see also Acevedo*, 2012 WL 4377323, at *4 ("[W]here a claimant's nonexertional limitations significantly limit his or her potential to meet the basic mental demands of working, the ALJ should consult a vocational expert.") (citations omitted).

### b. Duty to Develop the Record

"Social Security proceedings are inquisitorial rather than adversarial." *Sims v. Apfel*, 530 U.S. 103, 110-11 (2000). Consequently, "the social security ALJ, unlike a judge in a trial, must on behalf of all claimants . . . affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." *Moran*, 569 F.3d at 112 (internal quotation marks and citation omitted). As part of this duty, the ALJ must "investigate the facts and develop the arguments both for and against granting benefits." *Sims*, 530 U.S. at 111. Specifically, under the applicable regulations, in making a disability determination, the ALJ is required to develop a claimant's complete medical history. *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996) (citing 20

13

C.F.R. §§ 404.1512(d)-(f)). This responsibility "encompasses not only the duty to obtain a

claimant's medical records and reports but also the duty to question the claimant adequately

about any subjective complaints and the impact of the claimant's impairments on the claimant's

functional capacity." *Pena v. Astrue*, No. 07 Civ. 11099 (GWG), 2008 WL 5111317, at *8

(S.D.N.Y. Dec. 3, 2008) (citations omitted).

Whether the ALJ has met his duty to develop the record is a threshold question. Indeed,

before reviewing whether the Commissioner's final decision is supported by substantial evidence

under 42 U.S.C. § 405(g), "the court must first be satisfied that the ALJ provided plaintiff with 'a

full hearing under the Secretary's regulations' and also fully and completely developed the

administrative record." *Scott v. Astrue*, No. 09 Civ. 3999 (KAM), 2010 WL 2736879, at *12

(E.D.N.Y. July 9, 2010) (quoting *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751,

755 (2d Cir. 1982)). This imperative remains in force even where the claimant is represented by

counsel. *Perez*, 77 F.3d at 47.

### c.  Treating Physician Rule

"Regardless of its source, the ALJ must evaluate every medical opinion in determining

whether a claimant is disabled under the [Social Security] Act." *Pena ex rel. E.R. v. Astrue*, No.

11 Civ. 1787 (KAM), 2013 WL 1210932, at *14 (E.D.N.Y. Mar. 25, 2013) (citing 20 C.F.R.

§§ 404.1527(d), 416.927(d)). A treating physician's opinion, however, is given controlling

weight, provided the opinion as to the nature and severity of an impairment "is well-supported by

medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with

the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2); *accord Burgess*,

537 F.3d at 128 (recognizing deference to the views of the physician engaged in primary

treatment of claimant); *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (same). The

14

regulations define a treating physician as the claimant's "own physician, psychologist, or other acceptable medical source who provides [the claimant] . . . with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." 20 C.F.R. § 404.1502. Deference to such a medical source is appropriate because "these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical evidence alone or from reports of individual examinations." *Id.* § 404.1527(c)(2).

However, where "the treating physician issued opinions that [were] not consistent with other substantial evidence in the record, such as the opinion of other medical experts, the treating physician's opinion is not afforded controlling weight." *Pena*, 2013 WL 1210932, at *15 (quoting *Halloran*, 362 F.3d at 32) (internal quotation marks omitted); *see also Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) ("[T]he less consistent [the treating physician's] opinion is with the record as a whole, the less weight it will be given."). Thus, "a treating physician's opinion that the claimant is 'disabled' or 'unable to work' is not [automatically] controlling." *Guzman v. Astrue*, No. 09 Civ. 3928 (PKC), 2011 WL 666194, at *10 (S.D.N.Y. Feb. 4, 2011) (citing 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1)).

Importantly, however, "[t]o the extent that [the] record is unclear, the Commissioner has an affirmative duty to fill any clear gaps in the administrative record before rejecting a treating physician's diagnosis." *Selian*, 708 F.3d at 420 (quoting *Burgess*, 537 F.3d at 129) (internal quotation marks omitted); *see also Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998) (discussing ALJ's duty to seek additional information from treating physician *sua sponte* if clinical findings are inadequate). As a result, "the 'treating physician rule' is inextricably linked to the duty to

develop the record.  Proper application of the rule ensures that the claimant's record is

comprehensive, including all relevant treating physician diagnoses and opinions, and requires the

ALJ to explain clearly how these opinions relate to the final determination." *Lacava v. Astrue*,

No. 11 Civ. 7727 (WHP) (SN), 2012 WL 6621731, at \*13 (S.D.N.Y. Nov. 27, 2012) ("In this

Circuit, the rule is robust."), Report and Recommendation *adopted by* 2012 WL 6621722

(S.D.N.Y. Dec. 19, 2012).

To determine how much weight a treating physician's opinion should carry, the ALJ must

consider several factors that have been enumerated by the Second Circuit, including:

> (i) the frequency of examination and the length, nature and extent of the
> treatment relationship; (ii) the evidence in support of the treating
> physician's opinion; (iii) the consistency of the opinion with the record as
> a whole; (iv) whether the opinion is from a specialist; and (v) other factors
> brought to the Social Security Administration's attention that tend to
> support or contradict the opinion.

*Halloran*, 362 F.3d at 32 (citation omitted); *see* 20 C.F.R. § 404.1527(c).  If, based on these

considerations, the ALJ declines to give controlling weight to the treating physician's opinion,

the ALJ must nonetheless "comprehensively set forth reasons for the weight" ultimately assigned

to the treating physician. *Halloran*, 362 F.3d at 33; *see also Snell*, 177 F.3d at 133

(responsibility of determining weight to be afforded does not "exempt administrative

decisionmakers from their obligation . . . to explain why a treating physician's opinions are not

being credited") (referencing *Schaal*, 134 F.3d at 505, and 20 C.F.R. § 404.1527(d)(2)).  The

regulations require that the SSA "will *always give good reasons* in [a] notice of determination or

decision for the weight" given to the treating physician. *Pena*, 2013 WL 1210932, at \*15

(quoting 20 C.F.R. § 404.1527(c)(2)).  Indeed, "[c]ourts have not hesitate[d] to remand [cases]

when the Commissioner has not provided good reasons." *Id.* (quoting *Halloran*, 362 F.3d at 33).

Ultimately, the ALJ need not "reconcile explicitly every conflicting shred of medical testimony." *Galiotti v. Astrue*, 266 F. App'x 66, 67 (2d Cir. 2008) (quoting *Fiorello v. Heckler*, 725 F.2d 174, 176 (2d Cir. 1983)). Any conflicts in the medical evidence are left to the finder of fact to resolve and the courts may not substitute their judgments so long as the decision of the ALJ, and ultimately that of the Commissioner, "rests on adequate findings supported by evidence having rational probative force." *Id.* (quoting *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002)).

### d. Assessment of Claimant's Credibility

Finally, a reviewing court must defer to an ALJ's findings as to the credibility of a claimant. *Osorio v. Barnhart*, No. 04 Civ. 7515 (DLC), 2006 WL 1464193, at *6 (S.D.N.Y. May 30, 2006). The ALJ follows a two-step analysis for evaluating a claimant's subjective assertions of pain and other limitations. *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citing 20 C.F.R. § 404.1529(a)). First, the ALJ must weigh whether "the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged." *Id.* (citing 20 C.F.R. § 404.1529(b)). Second, if the answer to the first query is yes, the ALJ then considers "the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence of record." *Id.* (quoting 20 C.F.R. § 404.1529(a)) (internal quotation marks omitted).

Because "an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone," the ALJ may take into account a variety of other considerations as evidence. *Pena*, 2008 WL 5111317, at *11 (citing SSR 96-7p, 1996 WL 374186, at *3 (SSA July 2, 1996)). These include: a claimant's daily activities; the location, duration, frequency, and intensity of the individual's pain or other

17

symptoms; factors that aggravate the symptoms; treatment and medication necessitated by the

pain or other symptoms and their effects; other alleviating measures taken by the claimant; and,

other factors that relate to the claimant's functional limitations and restrictions stemming from

pain or other symptoms. *Id.*

So long as the "findings are supported by substantial evidence, the court must uphold the

ALJ's decision to discount a claimant's subjective complaints." *Vargas v. Astrue*, No. 10 Civ.

6306 (PKC), 2011 WL 2946371, at *11 (S.D.N.Y. July 20, 2011) (quoting *Aponte v. Sec'y of

Health and Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984)). However, these findings must "be

set forth with sufficient specificity to permit intelligible plenary review of the record." *Pena*,

2008 WL 5111317, at *10 (internal quotation marks omitted) (quoting *Williams v. Bowen,* 859

F.2d 255, 260-61 (2d Cir. 1988)).

**B. ALJ's Decision**

ALJ Gonzalez determined in his June 30, 2011 decision that Randolph did not meet the

statutory definition of disability under the Social Security Act and therefore denied her claims for

SSD and SSI benefits. Rec. at 20-21. Following the five-step inquiry into disability, the ALJ

first determined that Randolph had not engaged in substantial gainful activity since June 1, 2008,

the alleged date of her onset of disability. *Id.* at 14. At step two, the ALJ determined that

Randolph has the following severe impairments: Bipolar Disorder, Borderline Personality

Disorder, and drug and alcohol abuse in remission. *Id.* At step three, the ALJ determined that

none of these impairments met or were medically equal to impairments included in the SSA

listings. *Id.* at 15. At step four, the ALJ concluded that Randolph "has the residual functional

capacity to perform a full range of work at all exertional levels but with the following

nonexertional limitations: [Randolph] can only understand, remember and carryout simple work

18

related tasks." *Id.* at 16. The ALJ then determined that Randolph has no relevant past work experience, and, applying the Grids under step five, concluded that there exist a significant number of jobs in the national economy that Randolph can perform. *Id.* at 19, 20. The ALJ did not consider the testimony of a vocational expert.

The ALJ opined that Randolph was not "completely credible" as a witness, finding that her testimony about her problems with memory and concentration conflicted with her mental examinations, and that her testimony was "partially self-serving" and was not fully reflected in her medical records. *Id.* at 18. He also noted that her testimony was contradictory, because she claimed to have not drunk alcohol since 2009 but admitted that she went to bars in January 2010. *Id.* Finally, he observed that Randolph admitted to babysitting children in 2007, and found that this undermined her claim that she could not work well with others. *Id.*

## C. Analysis

### 1. The ALJ Did Not Comply with the Treating Physician Rule

Randolph argues that the ALJ failed to give controlling weight to the opinion of Dr. Srihari as her treating physician in determining that Randolph is not eligible for disability benefits. Pl. Mem., at 15-16.[3] The Commissioner counters that the ALJ properly assigned this opinion "no controlling weight" as it was not "well supported" and was "inconsistent with the weight of the evidence." Def. Mem., at 17. Because the ALJ did not identify what weight, if any, he afforded to the opinion of Randolph's treating physician, and did not adequately set out

---

[3]      Randolph's RFC report was signed by both Dr. Srihari and Griffin, Randolph's social worker. *See* Rec. at 286-88. To be clear, the Court refers to the RFC as a treating source opinion solely on the basis that it reflects Srihari's opinion, as Griffin's opinion as a social worker is not entitled to controlling weight. *See Bliss v. Comm'r of Soc. Sec.*, 406 Fed. App'x 541, 541 (2d Cir. 2011) ("[T]he assessment by the social worker is ineligible to receive controlling weight because social workers do not qualify as 'acceptable medical source[s].'") (citing 20 C.F.R. §§ 404.1513(a), 404.1527(a)(2)).

the reasons for discounting his opinion, this matter should be remanded to the Commissioner for further proceedings.

In his decision, the ALJ highlighted, over four pages of his decision, indications in the record that Randolph's limitations are controllable – *e.g.*, Dr. Capozzi's November 2009 statement that Randolph's medication helped her maintain a stable mood, Dr. Orsini's February 2010 opinion that Randolph could perform simple tasks, the ALJ's own findings that Randolph's testimony was not credible – to find that Randolph was not disabled under the listings. *Id.* at 16-19. Devoting merely two sentences to the subject, the ALJ dismissed Dr. Srihari's opinion by finding his conclusions in the RFC report that Randolph had serious limitations in mental functioning to be "not well supported by the treatment notes showing that the claimant['s] mental status examination was intact with only limited findings in the claimant's insight and judgment and concentration," and inconsistent with Randolph's own testimony about her activities. *Id.* at 19.

Although it is clear, given his ultimate determination, that he did not afford Dr. Srihari's opinion controlling weight, the ALJ does not specify whether he afforded some, little, or no weight whatsoever. By contrast, immediately after the ALJ's summary discussion of the RFC report, he states that he gave "some weight" to the February 2010 opinion of consultative examiner Dr. Alpert, who found that Randolph can "understand, remember and carryout simple work related tasks." *Id.* Consistent with the treating physician rule, it is the ALJ's obligation "to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion." SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996). Providing such clarification is no mere formality, because "[e]ven when a treating physician's opinion is not given *controlling* weight, the opinion is still entitled to *some weight*." *Clark v. Astrue*, No. 08

Civ. 10389 (LBS), 2010 WL 3036489, at \*4 (S.D.N.Y. Aug. 4, 2010) (citation omitted)

(emphasis added). Here, it could just as easily be inferred that the ALJ afforded no weight at all

to the treating physician's opinion, a drastic step that certainly requires more than a cursory, two-

sentence discussion. *See Ellington v. Astrue*, 641 F. Supp. 2d 322, 330 (S.D.N.Y. 2009) (even if

not controlling, treating physician's opinion still entitled to "significant" weight and should not

be "completely rejected"). Thus, the ALJ's failure to identify the precise weight given is in itself

error. *See, e.g.*, *Hach v. Astrue*, No. 07 Civ. 2517 (ENV), 2010 WL 1169926, at \*11 (E.D.N.Y.

Mar. 23, 2010) ("[T]he ALJ did commit legal error in failing to properly determine *how much*

weight should be afforded to [the treating physician's] opinion."); *Ellington*, 641 F. Supp. 2d at

330 ("[T]he ALJ committed legal error in not describing how much weight [accorded].").

The ALJ also failed to proffer good reasons for giving the treating physician's opinion as

little weight as he apparently did. It appears from the ALJ's cursory treatment of Dr. Srihari's

RFC report that he touched, very briefly, on two of the factors that must be considered. *See*

*Halloran*, 362 F.3d at 32; 20 C.F.R. § 404.1527(d). First, in finding that the treating physician's

opinion was contradicted by Randolph's testimony about her day-to-day functioning – which

revealed that she can do odd jobs and work with others to some degree – the ALJ identified an

inconsistency between the opinion and at least one aspect of the record. Rec. at 18-19. Second,

the ALJ directly questioned whether Dr. Srihari's opinion was supported by evidence, namely

his own treatment notes. *Id.* at 19. By contrast, the ALJ makes no mention of the other factors

identified as obligatory considerations by the regulations and the Second Circuit. For instance,

the ALJ did not consider whether Dr. Srihari was a specialist in the relevant field, whose opinion

would therefore merit particular credibility. *See Halloran*, 362 F.3d at 32; 20 C.F.R.

§ 404.1527(c)(2)(v). Nor did the ALJ address "the frequency of examination and the length,

nature, and extent of the treatment relationship" between Randolph and her treating professionals. *See Halloran*, 362 F.3d at 32; 20 C.F.R. § 404.1527(c)(2)(ii).

The failure of the ALJ to consider this last factor is particularly conspicuous. In contrast to the little or no weight given to Dr. Srihari's opinion, who treated Randolph from as early as July 2010 and continuing through at least 2011, *see* Rec. at 243, 290, the ALJ gave greater weight to Dr. Alpert's February 2010 report, which was compiled without an actual physical examination of Randolph. *Id.* at 215-18. Moreover, Alpert made this early assessment without the benefit of any of Srihari's later treatment notes. The timeliness of evidence is a factor that courts have considered in assessing the Commissioner's determination of disability. *See Acevedo*, 2012 WL 4377323, at *16 (collecting cases). "This is particularly true where the stale evidence relates to an RFC assessment that was completed before a full medical history was developed." *Id.* An analysis of the extent and nature of the treatment relationship would have allowed the ALJ to provide a proper explanation as to why he chose to rely on older, arguably more incomplete evidence.

In sum, the ALJ failed to consider all of the relevant factors necessary for discounting a treating physician's opinion. *See Clark*, 2010 WL 3036489, at *4 ("The ALJ committed legal error by failing to explicitly consider all the required factors."); *Ellington*, 641 F. Supp. 2d at 330 (remand in part where "the ALJ made no mention of important factors such as the length and the frequency of the treating relationship"). Because the ALJ failed to state what weight was given to Dr. Srihari's opinion and failed to provide good reasons for declining to give this opinion controlling weight, the case should be remanded.

## 2. The ALJ Should Reassess Whether He Must Consult a Vocational Expert After a Proper Review of the Record on Remand

Randolph further contends that, at step five of his analysis, the ALJ should have sought

the testimony of a vocational expert instead of relying solely on the Grids to find Randolph capable of existing work. Pl. Mem., at 16-17. The Commissioner argues that the ALJ properly declined to call a vocational expert because Randolph's impairments did not significantly limit her occupational base. Def. Mem., at 21-22. Because the ALJ's findings as to the extent of Randolph's limitations were based on an erroneous application of the treating physician rule, as described above, the Court does not need to reach this issue. Instead, the Court should direct the ALJ to reassess whether reliance on the Grids alone is permissible in light of a proper evaluation of the record, including Randolph's treating physician's opinion, on remand.

The ALJ concluded that Randolph's "ability to perform work at all exertional levels has been compromised by nonexertional limitations. However, the claimant's ability to perform only simple work related tasks has little or no effect on the occupational base of unskilled work at all exertional levels." Rec. at 20. Although he did not say so specifically, the ALJ determined that Randolph's nonexertional limitations were not significant in nature, a finding that would enable him to decline consultation of a vocational expert. *See Bapp*, 802 F.2d at 603. In the Second Circuit, even where a claimant suffers from mental illness, limitations that do not affect the ability to perform "basic mental demands of unskilled work, such as following simple instructions, and responding appropriately to supervisors and coworkers in usual work situations" are not considered significant. *Selian*, 708 F.3d at 422 (quoting *Zabala*, 595 F.3d at 411) (internal quotations omitted). Instead, courts will remand where the limitations in question result in marked, or at least moderate, effects. *See, e.g.*, *Baldwin v. Astrue*, No. 07 Civ. 6958 (RJH) (MHD), 2009 WL 4931363, at *28 (S.D.N.Y. Dec. 21, 2009) (ALJ failed to consult vocational expert despite findings that claimant suffered from "moderate limitations in numerous areas that bear on activities of daily living and social functioning"); *Zwick v. Apfel*, No. 97 Civ.

5140 (JGK), 1998 WL 426800, at *8 (S.D.N.Y. July 27, 1998) (moderate limitations cannot be considered negligible loss of work capacity).

Here, the record includes evidence suggesting that despite her impairments, Randolph was capable of unskilled work, including opinions from Drs. Orsini and Alpert that Randolph could follow simple instructions, perform tasks independently, and relate adequately to coworkers. *See* Rec. at 211, 218. However, the RFC report and treatment notes from Randolph's treating physician include conflicting evidence pointing to more serious limitations, describing her continued problems with aggression, emotional stability, anxiety, and social functioning. *See, e.g., id.* at 249, 252, 254, 295. None of this evidence was discussed by the ALJ in his decision; based on a proper consideration of the treating physician's opinion, it is certainly possible that the ALJ may determine that Randolph exhibited at least moderate limitations to functioning, thus requiring him to consult a vocational expert. Consequently, while the Court need not determine whether the ALJ erred on the question of reliance on the Grids at the present time, the Court should direct the ALJ to make a renewed determination on this question after a complete review of the evidence on remand.

### III. **CONCLUSION**

For the foregoing reasons, I recommend that Randolph's motion be granted to the extent that the case be remanded to the ALJ pursuant to sentence four of 42 U.S.C. § 405(g) and that the Commissioner's cross-motion be denied.[4] Specifically, I recommend that, on remand, the ALJ should:

(1) specify what weight he affords to Randolph's treating physician's opinion, if it is not

---

[4] Upon a finding that an ALJ has applied an improper legal standard, courts generally remand for further consideration. *Baldwin,* 2009 WL 4931363, at *28. A remand for further consideration, rather than simply for the calculation of benefits, is appropriate here.

deemed controlling;

(2) provide a comprehensive analysis for why he affords this particular weight to the treating physician's opinion, if it is not deemed controlling, based on the appropriate factors outlined above; and

(3) reconsider, based on his findings after a proper application of the treating physician rule, whether Randolph's nonexertional limitations, if any, are sufficiently significant to require consultation with a vocational expert.

## PROCEDURE FOR FILING OBJECTIONS
## TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. *See also* Fed. R. Civ. P. 6. Such objections, and any responses to such objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Laura Taylor Swain and to the chambers of the undersigned, United States Courthouse, 500 Pearl Street, New York, New York, 10007. Any requests for an extension of time for filing objections must be directed to Judge Swain. **FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.** 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.*, 596 F.3d 84, 92 (2d Cir. 2010).

Dated: New York, New York
      June 30, 2014

                              JAMES L. COTT
                              United States Magistrate Judge

25